**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DON ASCOLESE,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 18-1864** |
| | : | |
| **SHOEMAKER CONSTRUCTION CO.,** et al., | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                                         **April 19, 2021**

## <u>MEMORANDUM OPINION</u>

This is a *qui tam* action brought on behalf of the United States of America under the False Claims Act ("FCA") by Plaintiff-Relator Don Ascolese ("Relator"). Relator alleges that Defendants Shoemaker Construction Co. ("Shoemaker"), Shoemaker Synterra, a JV[1] ("SSAJV"),[2] and McDonough Bolyard Peck ("MBP") engaged in a scheme to defraud the government by submitting false claims for payment to the Philadelphia Housing Authority ("PHA") for deficient construction work performed by Defendants in connection with a public housing project funded by the United States Department of Housing and Urban Development ("HUD").

Defendants have each moved to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), contending that the Amended Complaint fails to meet threshold

---

[1]     SSAJV is a joint venture between Shoemaker, "a major East Coast builder," and a developer, Synterra LTD. (Am. Compl. ¶ 7.)

[2]     Defendant SSAJV is incorrectly named as "Shoemaker Synterra JV" in the Amended Complaint.

pleading requirements.  For the reasons stated below, I will grant in part and deny in part the motions.

## I.   **FACTUAL AND PROCEDURAL BACKGROUND**

At this stage of the litigation, I am required to take the facts directly from the Amended Complaint.[3]

### A.  The Alleged Scheme

In July 2014, HUD awarded PHA a $30 million grant to build mixed-income homes in North Philadelphia (the "Project").  This project involved the construction of 89 new rental units that were "a mix of two and three-story townhomes, including several disability accessible units . . . near the Temple University campus."  (Am. Compl. ¶ 12.)

PHA designated Defendant SSAJV as the construction manager for the Project.  Defendant MBP was hired in 2017 as "an independent Quality Assurance/Quality Control Manager."  (Id. at ¶ 8.)  Relator was employed by MBP as a Quality Assurance/Quality Control Manager and was hired for the Project on May 31, 2017.

MBP was hired to perform the following services: (1) "constructability review services for several building disciplines, including architectural, structural, civil-site, mechanical, electrical, plumbing, fire protection/life safety"; (2) "a comprehensive review of the Project's construction documents, including verifying that the design documents adhered to the Project's Program of Requirements"; (3) "coordination of the various disciplines being performed by the design professional"; (4) "assess the site logistics planning for site access, utility and adjacent facilities

---

[3]      When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Thus, I will assume that all the facts found in the Amended Complaint are true for purposes of Defendants' Rule 12(b)(6) and 9(b) arguments.

coordination"; and (5) "develop a Quality Assurance/Quality Control [] plan that included, among other things, review of various project drawings, performance management, inspecting and verifying construction activities, noting any construction deficiencies, and various document and record keeping functions." (Id. at ¶¶ 13–15.)

As part of MBP's contract, Relator, as the Project's Quality Assurance/Quality Control Manager, was required to maintain a Project Deficiency List. Relator alleges that over the course of his six months on the Project, he observed a number of deficiencies in "concrete work," which he noted in his deficiency log and reported to his supervisors at MBP and "the contractors." (Id. at ¶¶ 34, 47.) Relator attributes these deficiencies to the Project's running behind schedule: "it soon became apparent that the original time frame for placing the concrete foundation during warmer Fall weather was passing, and the Project went into a 'hurry-up' mode where the sole emphasis was on completing the work, even if it meant cutting corners, so as not to incur significant penalties from PHA and HUD for late completion of work." (Id. at ¶ 27.) Relator alleges that "[t]his cutting of corners took an ominous turn when defendants began to ignore fundamental safety issues." (Id. at ¶ 28.)

One of the deficiencies in concrete work identified by Relator was SSAJV's alleged "backfilling" over frozen ground in violation of "Division 31, Earthwork Sec. 31." (Id. at ¶ 30.) Relator claims that during the installation of pilings, "the Project encountered buried obstructions and the soil was frozen, which meant that it could not be used safely as backfill under the structural concrete slab in Building K of the Project." (Id. at ¶ 28.) Relator asserts that in his December 26, 2017 deficiency log, he made a notation regarding the frozen soil: "backfilling inside 'K' Building on top of frozen ground." (Id. at ¶ 30.) Relator states that when he noted this deficiency and complained, he was told that "another contractor, Ambric Technology Corp., had provided . . . a

3

report claiming that the frost had been removed from that area." (Id. at ¶ 31.)  Relator subsequently spoke to "an elderly man" who claimed that he worked for this other contractor and had witnessed the removal of the frozen soil.  (Id. at ¶ 32.)  Based on Relator's conversation with this person, he asserts that the report on the removal of frozen soil must have been fraudulently created by SSAJV and the frozen soil never removed because "[g]iven the depth of the freeze line and the large area containing frozen soil, it would have required equipment and manpower to accomplish such a task and the conditions at the site simply would not have permitted equipment to access this area."  (Id. at ¶¶ 32, 49.)

Relator also alleges that SSAJV failed to allow concrete used in foundational walls and slabs to fully cure before the forms were removed and that steel, horizontal rebar was not used in the concrete foundational walls as required by the standards of the American Concrete Institute ("ACI"), the Philadelphia Building Code, and the contract with PHA.[4]  (See id. at ¶¶ 16–24, 33–43, 47.)  For example, Relator claims that:

- On October 21, 2017, Relator raised a concern with "Superintendent Tice" that the "1st floor slab that was placed yesterday at 1925 N. 9th Street" was not cured properly.  (Id. at ¶¶ 36, 39.)

- On October 31, 2017, the Project Structural Engineer, Megan Holloway, "issued a report noting the concrete wall forms had been removed and noting that such an occurrence was allowed so long as the temperature remained above 50 degrees," and "[s]he recommended that the contractor provide adequate thermal protection, but this was never done."  (Id. at ¶ 40.)

- The next day, after the report from the Project Structural Engineer, two project and construction engineers from PHA exchanged emails, copying Relator, and "noted the removal of the [concrete] forms and backfilling and said: '[t]his does not seem to be in accordance with ACI standards.'"  (Id. at ¶ 41.)

---

[4]      Although not the focus of his claims under the FCA, Relator also asserts that "the grade beam for 1943-45-47-39 East side (rear) of the properties was not centered over the top of the piling and while some variance was permitted, not in the 8 to 16-inch variance noted at the site." (Am. Compl. ¶ 37.)

- That same day, Relator emailed the Architect Engineer, Daryn Edwards, "complaining about the removal of metal forms for the concrete foundation walls before they were cured and then backfilled." (Id. at ¶ 42.)   Relator stated in the email that "[a]gain there is disregard of the project plans and specifications . . . . The backfilling and compaction of the fill inside the unbraced walls in less than 18 hours compounds the situation." (Id.) Relator claims that despite this email, "[a]ll the wall forms and bracings were removed" and "[t]his was done without the knowledge or approval of the Project Structural Engineer." (Id.)

- On December 5, 2017, the Project Structural Engineer "responded to an earlier email of Relator about the need for rebar in the concrete foundation walls and noted that they were necessary." (Id. at ¶ 43.)

- Relator then circulated an email to "several individuals, including the PHA engineers noting that 'now we may have a problem with the foundation walls at [several of the Project buildings].   Concrete work at those locations do not meet that requirement.   What is the next step?'" (Id. at ¶ 43.)

After these multiple alleged email communications in which Relator informed his supervisors at MBP and certain project leaders at SSAJV about his concerns regarding the alleged deficiencies in concrete work, Relator claims that he was told by SSAJV that "he did not need to go out into the field and report deficiencies and that he should 'just put your feet up on the desk and take it easy.'" (Id. at ¶ 44.)

Relator claims that despite being made aware of various construction deficiencies, Defendants submitted invoices to PHA for progress payments on the deficient work. (Id. at ¶ 70.) In order to receive progress payments from PHA, Relator alleges that Defendants were required to certify that the work for which they sought payment from PHA was performed to contract specifications. (Id. at ¶ 66.)   Relator claims that Defendants falsely certified when requesting payment from PHA that the Project was being built to contract specifications and to the applicable building codes, thus defrauding PHA and HUD (who granted PHA the necessary funds) out of a significant, but yet unknown, sum.

Relator asserts that the deficiencies in concrete work will likely lead to "significant structural defects or . . . significant cracking or other deficiencies requiring expensive repairs long before they otherwise should have been necessary." (Id. at ¶ 70.) Relator explains that "[d]uring a freeze and thaw cycle, the concrete will need to expand and contract," which will "necessarily result in the sealing of the concrete." (Id. at ¶¶ 53–55.) Relator alleges that according to "ACI 301," concrete curing is "necessary for the cement particles to complete chemical reactions to fill the microscopic gaps inside the concrete so that it becomes stronger and performs better," and "the curing process must be given enough time to allow the concrete to achieve maximum strength." (Id. at ¶ 18; see also id. at ¶¶ 19–21.) Given the alleged lack of proper concrete curing, Relator asserts that "cracks will form that will allow water to penetrate the concrete" and "degradation will occur more rapidly resulting in the compromising of structural integrity." (Id. at ¶¶ 55–56.)

Relator also claims that SSAJV's failure to use rebar in foundational walls will significantly compromise the structural integrity of the Project's buildings. (See id. at ¶ 57.) Relator states that according to "ACI 318," rebar, "which is shorthand for reinforcing bar or steel, is a steel bar or mesh of steel wires used as a tension device in reinforced concrete and reinforced masonry structures to strengthen and hold the concrete in tension . . . [and] to form a better bond with the concrete." (Id. at ¶ 22.) Thus, according to Relator, "[c]oncrete that carries heavy loads, such as footings, foundation walls and columns, almost always requires reinforcing steel." (Id. at ¶ 23.) Relator asserts that "[t]he absence of rebar is an even more fundamental shortcoming [] effecting the structural integrity of the building" and "[t]he PHA engineers assigned to the Project expressed to Plaintiff their view and understanding that rebar was required on the project as it would in virtually all construction projects of similar size." (Id. at ¶ 57.)

On January 18, 2018, approximately eight months after he was hired, Relator was told by

MBP that "Shoemaker wants you off the job." (Id. at ¶¶ 46, 106.)  Relator was then removed from the Project and terminated by MBP, allegedly without explanation.[5]

### B.  Procedural Background

Based on these alleged facts, Relator filed the original Complaint, asserting violations of the FCA, unjust enrichment, and conversion.  As permitted by the FCA, Relator filed the original Complaint *ex parte* and under seal, allowing the United States government the opportunity to investigate.

On February 4, 2019, the Government filed its Notice of Election to Decline Intervention, declining to intervene but permitting Relator to maintain the action in the name of the United States, providing that I first solicit the written consent of the United States before dismissing the case upon agreement of the parties.  Thereafter, I unsealed the case and ordered the Complaint served on Defendants.

Relator filed an Amended Complaint on April 18, 2019, bringing claims for violation of the following FCA provisions: 31 U.S.C. § 3729(a)(1)(A) (Count I), 31 U.S.C. § 3729(a)(1)(B) (Count II), and 31 U.S.C. § 3730(h) (Count III).  Defendants Shoemaker and SSAJV and Defendant MPB have each moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

---

[5]  Relator also appears to claim that Defendants falsely certified to PHA that they were in compliance with Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u, et seq.  Relator alleges that Defendants violated Section 3 by hiring "a single male who was Section 3 eligible and was rotated around between different contractors to deceive PHA into believing that they had met the Section 3 requirements."  (Am. Compl., ¶¶ 94–98); see also 12 U.S.C. § 1701u(c)(1)(A) (requiring public housing agencies and their contractors and subcontractors to "make their best efforts . . . to give low- and very low-income persons . . . training and employment opportunities."); 12 U.S.C. § 1701u(c)(2)(A) (requiring the Secretary of HUD to "ensure that, to the greatest extent feasible . . . opportunities for training and employment arising in connection with . . . a housing construction, or other public construction project are given to low- or very low-income persons residing within the metropolitan area.").

## II.   **LEGAL STANDARD**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id.   To determine the sufficiency of a complaint under Twombly and Iqbal, a court must (1) "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, . . . assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (internal quotation marks omitted).

It is well-established, however, that *qui tam* actions brought under the FCA must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b).   U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 n.9 (3d Cir. 2004) (citing U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998)); U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 143 (E.D. Pa. 2012).   Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).   This heightened pleading standard requires plaintiffs to "plead with particularity precise misconduct with which they are charged [in order] to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).   "Thus, Rule 9(b) requires, at

a minimum, that plaintiffs support their allegations . . . with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue."  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks omitted).  However, courts will accept allegations on information and belief when "the facts at issue are peculiarly within the defendant's possession."  See Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 107 n.31 (3d Cir. 2015); Rockefeller, 311 F.3d at 216.

## III.   DISCUSSION

### A.  Counts I and II: The Alleged Submission of False Claims

Defendants may be held liable for Counts I and II, if I find that they (1) "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" (Count I) or (2) "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim" (Count II).  31 U.S.C. § 3729(a)(1)(A)–(B).  Accordingly, in order to survive dismissal, Relator must plead with particularity falsity, causation, scienter, and materiality.  U.S. ex rel. Bookwalter, v. UPMC, 946 F.3d 162, 175 (3d Cir. 2019).

### 1.  SSAJV and Shoemaker

Defendants SSAJV and Shoemaker (collectively, "SSAJV") argue that Relator has failed to sufficiently plead, under Rule 9(b) and 12(b)(6), all four elements (falsity, causation, scienter, and materiality) of its three false certification theories.

### i.  Relator's First False Certification Theory

SSAJV first argues that Relator has failed to plead with particularity facts supporting his theory that SSAJV falsely certified contractual conformance to PHA when SSAJV had failed to

follow the Project's specifications.  SSAJV contends that Relator's first FCA theory fails because (1) Relator does not allege specific contractual requirements that SSAJV violated, (2) he does not allege that SSAJV was required to remediate all pending or potential deficiencies before requesting a progress payment; (3) he fails to plead the alleged construction deficiencies with sufficient particularity, (4) he does not identify particular false claims that SSAJV caused to be submitted, (5) the Amended Complaint demonstrates that PHA knew about the alleged construction deficiencies and paid SSAJV anyway, which negates the scienter requirement and precludes a finding of materiality, and (6) the existence of a retainage provision in the contract renders the construction deficiencies immaterial to PHA's decision to pay progress payments.

I disagree with SSAJV for a number of reasons.  **First**, Relator alleges that the contract required SSAJV's concrete work to comply with the following building codes and regulations and that the construction deficiencies of which Relator had personal knowledge violated those provisions: "the latest editions of applicable local and state building codes and regulations, including but not limited to the 2009 International Building Code and 2009 International Residential Code" and "the American Concrete Institute ("ACI") that governs . . . the processes to be followed . . . [specifically ACI] sections 301, 'Specification for Structural Concrete for Buildings,' 318, 'Building Code Requirements for Structural Concrete,' 305, 'Hot Weather Concreting,' and 306, 'Cold Weather Concreting.'" (Am. Compl. ¶¶ 16–22; see also id. at ¶¶ 29–30 65.)  Relator also identifies several "concrete" and "slab" specifications in the contract that SSAJV allegedly violated.  (See id. at ¶ 24.)  In support of these allegations, Relator cites to and attaches relevant sections of the contract to the Amended Complaint.  (See id. at Ex. A.)

Additionally, SSAJV acknowledges that at this stage of the case, I may consider the provisions of HUD's form contract as the applicable contract because Relator explicitly relies on

that contract in the Amended Complaint.   (See id. at ¶¶ 87–90.); see also Sunlight Elec. Construction. Co. v. Turchi, No. 08-5834, 2011 WL 4086077, at *1 (E.D. Pa. Sept. 13, 2011) (citing Brown v. Daniels, 128 F. App'x 910, 913 (3d Cir. 2005)) (recognizing that in evaluating a motion to dismiss, a court may consider "documents that form the basis of a claim" or documents that are explicitly relied upon in the complaint).  That form contract states that "[t]he Contractor shall give all notices and comply with all applicable laws, ordinances, codes, rules and regulations. Notwithstanding the requirement of the Contractor to comply with the drawings and specifications in the contract, all work installed shall comply with all applicable codes and regulations as amended by waivers."  (SSAJV's Br., Ex. A, ¶ 12.)  Thus, I find that the Amended Complaint provides SSAJV with adequate notice regarding the contract provisions that it is alleged to have violated.

**Second**, SSAJV contends that because Relator does not allege that SSAJV was required to remediate all pending or potential deficiencies before requesting a progress payment, his claims fail.  But such a requirement is not the basis of Relator's false certification theory.  Rather, Relator alleges that when submitting for progress payments from PHA, SSAJV was required to certify each time that the work for which it sought payment was performed to contract specifications. Thus, the focus of Relator's theory is SSAJV's allegedly false certification when requesting each progress payment for work performed that Relator had identified as deficient.  In fact, the HUD form contract, attached by SSAJV to its motion, includes this exact requirement:

> (b) The PHA shall make progress payments approximately every 30 days as the work proceeds, on estimates of work accomplished which meets the standards of quality established under the contract . . . .
>
> (e) Along with each request for progress payments and the required estimates, the Contractor shall furnish the following certification, or payment shall not be made: I hereby certify, to the best of my knowledge and belief, that:

11

> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract . . . .

(SSAJV's Br., Ex. A, ¶ 27(b), (e).)

**Third**, I disagree with SSAJV that Relator has failed to sufficiently plead the alleged construction deficiencies and the scheme to submit false claims based on those deficiencies. In order to meet the 9(b) pleading requirements in the FCA context, the plaintiff is required to provide "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia v. Renal, Ventures Mgmt., LLC, 754 F.3d 153, 157–58 (3d Cir. 2014) (citing U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)). An FCA claimant is not required to show "the exact content of the false claims in question" to survive a motion to dismiss, as "requiring this sort of detail at the pleading stage would be 'one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'" Foglia, 754 F.3d at 156 (quoting Grubbs, 565 F.3d at 190).

In Foglia v. Renal Ventures Management, LLC, the plaintiff alleged that a dialysis center was not actually using all of the medicine for which it was getting reimbursed by Medicare. 754 F.3d at 158. The Third Circuit held that the following theory of fraud was sufficient to meet Rule 9(b)'s heightened pleading standard:

> Accepting the factual assertions made by Foglia as true, we have patient logs that show that less Zemplar was used than would be required if it were used in the single use fashion. We know that Medicare will reimburse for the full vial of Zemplar, regardless of whether all of the Zemplar is used, and that this provides an opportunity for the sort of fraud alleged by Foglia. At this point we must assume that Foglia is correct in alleging that Renal did not follow the procedures that it should have followed if it was to harvest the 'extra' Zemplar from the used vials. Although we recognize that this hypothesis could be challenged, it certainly suffices to give Renal notice of the charges against it, as is required by Rule 9(b). This conclusion is further supported by the fact that Renal, and only Renal, has

access to the documents that could easily prove the claim one way or another—the full billing records from the time under consideration.

Id.

In <u>U.S. ex rel. Customs Fraud Investigations, LLC v. Vitaulic Co.</u>, the relator, a customs fraud investigator, brought a reverse FCA claim against a manufacturer and distributor of pipe fittings, stemming from its failure to pay a "marking duty" on imported products, pursuant to the Tariff Act. 839 F.3d 242, 246–47 (3d Cir. 2016). The relator had not alleged "which shipments, during which time periods, at which ports, were supposedly unlawful" in the complaint. <u>Id.</u> at 258 (internal quotation marks omitted). But the relator did allege that "far more Vitaulic pipe fittings on the secondary market should have country-of-origin markings, that the way marking duties are assessed provides an opportunity for fraud, and that only Vitaulic has access to the documents that could prove or disprove the CFI's well-pled allegations." <u>Id.</u> Relying on <u>Foglia</u>, the Third Circuit concluded that these allegations were sufficient to satisfy Rule 9(b). <u>Id.</u>

Here, based on the Rule 9(b) pleading standards set forth in <u>Foglia</u> and <u>Vitaulic</u>, I find that Relator has pled the alleged construction deficiencies with sufficient particularity to provide SSAJV with adequate notice of the claims. Relator identifies specific locations of specific construction deficiencies based on his personal knowledge or his own observations, such as "backfilling inside 'K' Building on top of frozen ground," (Am. Compl., ¶ 30), or improper concrete curing of the "1st floor slab . . . at 1925 N. 9th Street," placed on October 20, 2017. (<u>Id.</u> at ¶ 39.) Relator also clearly categorizes the alleged construction deficiencies that form the basis of his false certification theory—improper concrete curing, including the removal of forms too quickly or at the wrong temperatures; improper backfilling on top of frozen soil; and the failure to use rebar to reinforce foundational walls.

Moreover, Relator alleges that he logged every deficiency that fell within these categories on the Project Deficiency List, which he uploaded to the Project Submittal Exchange and which is in the possession and control of SSAJV. Relator identifies the specific dates on which he logged or reported these deficiencies to his supervisors at MBP or to SSAJV project leaders. (Id. at ¶ 29 ("Relator made notations in his deficiency logs about the improper removal of concrete forms on November 1, 2017, November 3, 2017 and November 30, 2017."); id. at ¶ 30 ("Relator made notations in his deficiency logs on December 26, 2017 that 'backfilling inside 'K' building on top of frozen ground.'"); id. at ¶ 65 ("Relator made two notations in his deficiency logs about improperly cured concrete slabs on October 19, 2017 and November 1, 2017."); see id. at ¶¶ 34–43.)

I also disagree with SSAJV's position that without identification of the specific false claims submitted to PHA, Relator's FCA claims fail. As the Third Circuit held in Foglia and Vitaulic, to require this sort of detail at the pleading stage would be "one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." Foglia, 754 F.3d at 156 (internal quotation marks omitted). At this stage, Relator need only allege reliable indicia leading to a strong inference that false claims were actually submitted. Consideration of the following alleged facts leads me to conclude that the Rule 9(b) requirements have been met:

- Concrete work for the Project violated contract specifications and relevant building codes and regulations;

- These construction deficiencies were not remediated;[6]

---

[6] (Id. at ¶ 52 ("[A]t no time did SSJ[A]V ever remove or repour the concrete that was originally poured without rebar and without allowing it to cure and without performing the required compression tests."); id. at ¶ 32 ("Given the depth of the freeze line and the large area containing frozen soil, it would have required equipment and manpower to accomplish such a task and the conditions at the site simply would not have permitted equipment to access this area.").)

- SSAJV sought progress payments from PHA for the deficient work;

- The contract required SSAJV to certify that the work for which it sought progress payments was performed to the requisite contract specifications and building codes and regulations; and

- PHA paid SSAJV for its progress.

**Fourth**, I disagree with SSAJV that Relator has failed to sufficiently plead the FCA's scienter requirement.  SSAJV contends that the scienter requirement is negated by PHA's knowledge of SSAJV's alleged contractual nonconformance.  It is true that where the government knows and approves of the facts underlying the allegedly false claim, the government knowledge inference defense precludes a finding of scienter.  U.S. ex rel. Spay v. CVS Caremark Corp., 875 F.3d 746, 756 (3d Cir. 2017) ("[T]he government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation." (internal quotation marks omitted).)

In Universal Health Services, Inc. v. United States ex rel. Escobar, the United States Supreme Court made clear that a court may consider the existence of the government knowledge inference at the motion to dismiss stage.  136 S. Ct. 1989, 2004 n.6 (2016).  "Escobar did not, however, alter the fundamental procedural rule that 'a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.'"  Smith v. Carolina Med. Ctr., 274 F. Supp. 3d 300, 319 (E.D. Pa. 2017) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).  Accordingly, a district court should not infer government knowledge where "defendants rely on allegations outside the complaint[ ] . . . ."  Id.; see also U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C., No. 12-7199, 2018 WL 3091255, at *14 (S.D.N.Y. June 23, 2018) ("[T]hese unsubstantiated assertions about what [the government] must have known relate to facts beyond the scope of the complaints and cannot be resolved at the pleading stage.").

Although this defense is referred to as the "government knowledge inference" defense, "knowledge alone on the part of the government is insufficient to establish an FCA defense." Id. at 758.  Thus, as the Third Circuit has reasoned, "the government knowledge inference might be more aptly named the 'government acquiescence inference.'"  Id.  A defendant must prove the following two elements in order to negate the scienter requirement: "(1) the government knew about the false statement(s), and (2) the defendant knew that the government knew." Id.  "Mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance, and even actual knowledge that certain requirements were violated is not dispositive." Smith, 274 F. Supp. 3d at 319 (internal quotation marks omitted) (citing U.S. ex rel. Escobar v. Universal Health Servs., Inc., 842 F.3d 103, 110–12 (1st Cir. 2016)).

Here, SSAJV argues that an inference may be drawn from Relator's own allegations, i.e. Paragraphs 8, 15, 26, 41, 49(F), and 64, that PHA had actual knowledge of the construction deficiencies alleged in the Amended Complaint when it paid SSAJV for its progress and, thus, SSAJV's alleged fraud.  But Relator has not alleged that PHA had actual knowledge of all construction deficiencies identified by Relator or, more importantly, that PHA knew SSAJV had falsely certified that this work was performed properly in order to receive payment from PHA. SSAJV points out that the Project Deficiency List was uploaded to the Project Submittal Exchange, a shared document platform with PHA that PHA regularly accessed.  However, there is no allegation in the Amended Complaint that the Project Submittal Exchange was shared with PHA or that PHA regularly accessed this platform.

SSAJV also argues that because two engineers from PHA were members of the Project team, PHA had knowledge of all alleged deficiencies.  Paragraph 41 of the Amended Complaint supports that these two engineers may have had knowledge of one type of construction deficiency.

However, the allegations in the Amended Complaint are insufficient at this stage of the case to establish that these two individuals had actual knowledge of all deficiencies.  And, again, the Amended Complaint fails to allege that PHA was aware of any alleged fraud.

As noted above, SSAJV must also prove that PHA approved of or acquiesced to the submission of false statements.  SSAJV presses that because PHA continued to pay SSAJV for its progress, this requirement of the defense is met.  But SSAJV fails to cite to any paragraph in the Amended Complaint that would establish that payments from PHA were made to SSAJV with actual knowledge of the false certifications submitted by SSAJV.

SSAJV also cannot establish the second prong of the government knowledge inference defense based solely on the allegations in the Amended Complaint—that the defendant knew that the government knew about the false statements.  There is no allegation that SSAJV knew that PHA knew it was submitting false certifications for deficient work in order to receive progress payments from PHA.  Thus, at this stage of the case, the Amended Complaint does not contain sufficient facts to prove the government knowledge inference defense.

**Finally**, SSAJV's contends that the existence of a retainage provision in the contract renders the deficiencies immaterial to PHA's decision to pay progress payments.  Relying on the HUD form contract, SSAJV argues that PHA was required to withhold 10% of all progress payments as "retainage"—in other words, until the Project is complete and PHA accepts all work. (See SSAJV's Br., Ex. A, ¶ 27(f).)  Based on this provision, SSAJV posits that Relator cannot show that if PHA had known about the deficiencies at the time SSAJV sought progress payments, PHA would not have paid because SSAJV would still have had the opportunity to correct those deficiencies before seeking final payment from PHA.  But Relator's false certification theory does not center on PHA's final payment, which requires the remediation of all pending construction

deficiencies.  Rather, Relator focuses on the certifications of contractual compliance that SSAJV was required to submit each time it requested a progress payment from PHA, which Relator alleges were false.

Relator adequately alleges, at this stage of the case, that SSAJV's false certifications to PHA were material.  He asserts that the construction deficiencies he logged, if not remediated, would compromise the structural integrity of the Project's buildings.  He also claims that if PHA had known SSAJV was falsely certifying its contractual compliance—a certification that PHA explicitly required and on which progress payments were conditioned under the contract—then PHA would not have paid SSAJV.  (See Am Compl., ¶¶ 53–57, 71.)

Thus, SSAJV's motion to dismiss is denied as to Relator's first theory of false certification.

### ii.   Relator's Second False Certification Theory

SSAJV also seeks dismissal of the Amended Complaint regarding Relator's second theory of false certification—that SSAJV falsely certified contractual conformance with the Project's specifications based on falsified tests and records.

SSAJV argues that this second theory of falsity must be dismissed for failure to meet the pleading requirements of Rule 9(b).  I disagree for the following reasons.

Relator alleges that SSAJV knew that the concrete work was deficient and concealed the deficiencies through falsified records.  In support, Relator alleges that when he raised with other members of the Project his concerns about the backfilling over frozen soil, he "was told that another contractor, Ambric Technology Corp., had provided . . . a report claiming that the frost had been removed" and that Relator "encountered an elderly man, who claimed he worked for Ambric Tech, and said he had witnessed the removal of the frozen soil."  (Am. Compl. ¶¶ 31–32.) Relator claims that any such report was false because "[g]iven the depth of the freeze line and the

large area containing frozen soil, it would have required equipment and manpower to accomplish such a task and the conditions at the site simply would not have permitted equipment to access this area." (Id. at ¶ 32.) Based on these allegations and for the reasons set forth above in Section III.A.1.i, I find that Relator has provided SSAJV with adequate notice regarding this claim. Thus, I conclude that Relator's second false certification theory against SSAJV passes muster under Rule 9(b).[7]

### iii. Relator's Third False Certification Theory

Relator also appears to base his FCA claims on a third theory of false certification—SSAJV's alleged failure to comply with Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u, et. seq. Relator alleges, "on information and belief," that SSAJV falsely certified to PHA that it had hired the requisite number of low-income persons and Section 3 residents of PHA housing to work on the Project. (Am. Compl., ¶ 97.) Relator claims that "the contractors on the job hired a single male who was Section 3 eligible and was rotated around between different contractors to deceive PHA into believing that they had met the Section 3 requirements." (Id. at ¶ 98.) Relator alleges that he objected to this "subterfuge" and "advised PHA that it should not submit payment because of this subterfuge and failure to comply with the contract." (Id.) According to Relator, SSAJV was aware of this particular "scheme to defraud PHA." (Id.)

SSAJV responds that this theory cannot survive because (1) Section 3 requires that contractors make only "their best efforts" to give low-income persons training and employment

---

[7]    The facts alleged support Relator's second false certification theory only as to the backfilling deficiency. It is not clear whether Relator intends to pursue this theory as to the other alleged construction deficiencies, but, to the extent that he does, I find that Relator has not adequately pled this theory as to any other alleged deficiency.

opportunities and (2) the Amended Complaint makes no allegations regarding SSAJV's efforts to employ low-income persons.  I agree.  Section 3 provides that the Secretary of HUD must require public housing agencies and their contractors and subcontractors to "make their best efforts . . . to give low- and very low-income persons . . . training and employment opportunities."  12 U.S.C. § 1701u(c)(1)(A).  In addition, Section 3 requires that the Secretary of HUD "ensure that, to the greatest extent feasible . . . opportunities for training and employment arising in connection with . . . a housing construction, or other public construction project are given to low- or very low-income persons residing within the metropolitan area."  12 U.S.C. § 1701u(c)(2)(A).

Here, I find that Relator has failed to adequately allege that SSAJV violated these provisions and, therefore, that any submission of claims based on compliance with Section 3 was false.  First, I note that Relator does not allege that SSAJV hired the single man that he identifies, only that "the contractors on the job" did.  (Id. at ¶ 98.)  Even assuming that Relator meant to identify SSAJV, there is no allegation that hiring this one man was, in fact, a violation of Section 3.  The Amended Complaint asserts what appear to be requirements for "Section 3 businesses," but there is no allegation that SSAJV was or sought to be a Section 3 business.  (Id. at ¶ 96.)  And the Amended Complaint is otherwise devoid of facts regarding SSAJV's efforts to employ low-income persons on the Project and/or the feasibility of hiring such persons.

Moreover, Relator fails to adequately allege the remaining requirements of an FCA claim as to this theory.  Relator does not identify what provision of the contract these alleged hiring practices would violate.  And there is no allegation, even upon "information and belief," that if PHA had known of SSAJV's violation of Section 3, then it would not have provided SSAJV with progress payments.  It is also not alleged that the contract, which allegedly requires certification of compliance with contract specifications and relevant building codes and regulations for the work

performed, also requires certification of compliance with Section 3.  Finally, Relator alleges only in a conclusory fashion that SSAJV had knowledge of this alleged scheme to defraud PHA.  (Id. at 98.)  Therefore, I will dismiss Relator's third false certification theory against SSAJV.

### 2.  MBP

MBP also seeks to dismiss Relator's false certification claims.  MBP argues that Relator fails to meet the pleading requirements of Rule 9(b) because Relator improperly refers to Defendants collectively throughout the Amended Complaint but does not otherwise plead with particularity that MBP submitted (or caused to be submitted) false claims to PHA.

While Relator adequately pleads a scheme to defraud PHA with regard to SSAJV, I find that Relator's allegations as to MBP are deficient.  Although Relator alleges that he reported the alleged construction deficiencies to his supervisors at MBP, as pled, the reliable indicia of the scheme to falsely certify contractual compliance to PHA for purposes of receiving progress payments are specific only to SSAJV.  In Paragraph 69 of the Amended Complaint, Relator explicitly identifies the "who, what, where, when, and how" of the alleged fraudulent scheme, as required under Rule 9(b).  When identifying the "who," Relator names only SSAJV.  (Am. Compl. ¶ 69.)

Relator also does not allege any specific act of wrongdoing by MBP.  Relator's attempt to plead fraud against MBP by referring to Defendants collectively is not sufficient under Rule 9(b). Binder v. Weststar Mtg., Inc., No. 14-7073, 2016 WL 3762710, at *3 (E.D. Pa. July 13, 2016) ("An allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim."); Indianapolis Life Ins. Co. v. Hentz, No. 06-2152, 2008 WL 4453223, at *11 (M.D. Pa. Sept. 30, 2008) ("Typically, a plaintiff cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant.")

Thus, without allegations concerning MBP's specific role in the scheme, including (1) whether MBP sought progress payments from PHA and was paid, (2) whether MBP was also required to certify contractual compliance, even if SSAJV sought progress payments on its behalf, and (3) whether MBP had knowledge of these allegedly false certifications, Relator's false certification FCA claims against MBP will be dismissed.

### B. Count III: Retaliation under the FCA

Relator has also brought a claim for retaliation under the FCA (Count III) against all Defendants. This provision of the FCA entitles "[a]ny employee, contractor, or agent . . . to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated other in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1).

### 1. MBP

MBP argues that Relator has failed to plausibly plead a retaliation claim against it because Relator cannot establish that he engaged in any protected conduct. In order to establish an FCA retaliation claim, Relator must allege that (1) he engaged in protected conduct ("in furtherance of an [FCA] action . . . or other efforts to stop 1 or more violations of [the FCA]") and (2) he was discriminated against because of his protected conduct. U.S. ex rel. Petras v. Simparel, Inc., 857 F.3d 497, 507 (3d Cir. 2017). "Generally, the Third Circuit has held that performance within the function of one's position as an employee is not considered 'protected conduct.'" Odoms v. YWCA of Bucks Cnty., No. 12-7146, 2013 WL 3213355, at * 3 (E.D. Pa. June 25, 2013) (citing Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 188 (3d Cir. 2001)). In proving that he

was discriminated against "because of" his protected conduct, Relator must show that (1) MBP had knowledge that he was engaged in protected conduct and (2) MBP's retaliation was motivated, at least, in part by his engaging in protected conduct.  Hutchins, 253 F.3d at 186.    The Third Circuit has held that the knowledge prong requires the employee to put his employer "on notice of the distinct possibility of False Claims Act litigation."  Petras, 857 F.3d at 507 (internal quotation marks omitted); see also Hutchins, 253 F.3d at 188.

MBP seems to argue that Relator cannot allege that he engaged in protected conduct because he was a Quality Assurance/Quality Control Manager on the Project and it was his job to note and report any construction deficiencies.  Simply because Relator's position required him to note and report construction deficiencies does not mean that he cannot engage in protected activity and, therefore, bring a retaliation claim against MBP.  It was not within Relator's job duties to report illegal conduct or government fraud, so even as a Quality Assurance/Quality Control Manager, Relator can pursue a claim for retaliation under the FCA.

However, I do agree with MBP that Relator has failed to plausibly plead that MBP had knowledge that he was engaged in protected conduct.  In order to provide sufficient notice and establish the requisite knowledge, Relator must allege that his complaints were framed as concerns regarding illegal conduct or government fraud.  See Reid v. Temple Univ. Hosp. Episcopal Campus, No. 17-2197, 2017 WL 5157620, at *4 (E.D. Pa. Nov. 7, 2017).

Here, Relator has alleged that he noted and reported to MBP, SSAJV, and, at times, PHA that certain concrete work performed was not compliant with contract specifications and/or building codes and regulations.  Those allegations demonstrate that Relator was performing the functions of his position.  What those allegations do not plausibly plead is that MBP was otherwise aware that Relator was concerned that MBP and/or SSAJV was falsely certifying contractual

compliance in order to receive progress payments from PHA.   Relator pleads no facts demonstrating that any of his reported complaints to Defendants were about illegal conduct or fraud on PHA.   Thus, as Relator has failed to sufficiently plead that MBP knew he was engaging in protected conduct, his retaliation claim against MBP will be dismissed.

### 2.   SSAJV and Shoemaker

SSAJV argues that Relator cannot pursue a retaliation claim against it because Relator was not an employee, contractor, or agent of SSAJV.   Relator responds that because SSAJV caused his removal from the Project, he may pursue a retaliation claim against it.

Relator relies primarily on O'Hara v. Nika Techs., Inc., 878 F.3d 470 (4th Cir. 2017) to support his claim against SSAJV.   He argues that because O'Hara held that § 3730(h)(1) does not condition protection on the employment relationship between a whistleblower and the subject of his disclosures, he may pursue a retaliation claim against SSAJV.   Relator misreads O'Hara.   In that case, an employee sued his employer, claiming that his employer fired him for disclosing another company's fraud on the government.   878 F.3d at 472.   The United States Court of Appeals for the Fourth Circuit held that § 3730(h)(1) allowed a retaliation claim against his employer even though the subject of the employee's disclosure concerned the fraud of another company.   Id. at 475.   Here, O'Hara would allow Relator to bring a retaliation claim against MBP based on SSAJV's alleged fraud if Relator was asserting that his reporting of SSAJV's fraud to MBP resulted in his removal.   But O'Hara does not permit Relator to sue SSAJV for retaliation unless Relator was an employee, contractor, or agent of SSAJV.   Relator has pled no such relationship to SSAJV and thus, as a matter of law, Relator cannot pursue a retaliation claim against SSAJV. Count III is therefore dismissed as to SSAJV.

**IV.      CONCLUSION**

For the foregoing reasons, both motions to dismiss are granted in part and denied in part. Regarding MBP, all claims are dismissed <u>without prejudice</u>.  Regarding SSAJV and Shoemaker, (1) Relator's false certification claim based on SSAJV's alleged failure to comply with Section 3 of the Housing and Urban Development Act is dismissed <u>without prejudice</u> and (2) Relator's FCA retaliation claim is dismissed <u>with prejudice</u>.  The motions are denied as to all remaining claims. For only those claims dismissed without prejudice, Relator may seek leave to file a Second Amended Complaint if, in good faith, he is able to cure the deficiencies set forth above.

An appropriate Order follows.